PETER HOGG AND CORNELIUS H. DELAMATER, PLAINTIFFS IN·ERROR, v. JOHN B. EMERSON.

When a case is sent to this court under the discretion conferred upon the court below by the seventeenth section of the act of July 4, 1836 (Patent Law), 5 Stat. at Large, 124, the whole case comes up, and not a few points only.

The specification constitutes a part of a patent, and they must be construed together.

Emerson's patent for " certain improvements in the steam-engine, and in the mode of propelling therewith either vessels on the water or carriages on the land," decided not to cover more ground than one patent ought to cover, and to be sufficiently clear and certain.

A patentee, whose patent-right has been violated, may recover damages for such infringement for the time which intervened between the destruction of the patent-office by fire, in 1836, and the restoration of the records under the act of March 3, 1837.

THIS case was brought up, by writ of error, from the Circuit Court of the United States for the Southern District of New York. It was a suit for the violation of a patent-right, and the writ of error was allowed under the seventeenth section of the act of 1836.

On the 8th of March, 1834, John B. Emerson, the defendant in error, obtained the following letters-patent, (which were recorded anew on the 5th of March, 1841), viz. : —

The United States of America, to all to whom these letters-patent shall come :

Whereas John B. Emerson, a citizen of the United States, hath alleged that he has invented a new and useful improvement in the steam-engine, which improvement he states has not been known or used before his application; hath made

37 *

Hogg et al. *v.* Emerson.

oath that he doth verily believe that he is the true inventor or discoverer of the said improvement; hath paid into the treasury of the United States the sum of thirty dollars, delivered a receipt for the same, and presented a petition to the Secretary of State, signifying a desire of obtaining an exclusive property in the said improvement, and praying that a patent may be granted for that purpose. These are therefore to grant, according to law, to the said John B. Emerson, his heirs, administrators, or assigns, for the term of fourteen years from the eighth day of March, one thousand eight hundred and thirty-four, the full and exclusive right and liberty of making, constructing, using, and vending to others to be used, the said improvement, a description whereof is given in the words of the said John B. Emerson himself, in the schedule hereto annexed, and is made a part of these presents.

In testimony whereof, I have caused these letters to be made patent, and the seal of the United States to be hereunto affixed.

[L. S.] Given under my hand, at the city of Washington, this eighth day of March, in the year of our Lord one thousand eight hundred and thirty-four, and of the independence of the United States of America the fifty-eighth.

ANDREW JACKSON.

By the President:

LOUIS MCLANE, *Secretary of State.*

CITY OF WASHINGTON, *to wit:*

I do hereby certify, that the following letters-patent were delivered to me on the eighth day of March, in the year of our Lord one thousand eight hundred and thirty-four, to be examined; that I have examined the same, and find them conformable to law; and I do hereby return the same to the Secretary of State, within fifteen days from the date aforesaid, to wit, on this eighth day of March, in the year aforesaid.

B. F. BUTLER,
*Attorney-General of the United States.*

The schedule referred to in these letters-patent, and making part of the same, containing a description in the words of the said John Brown Emerson himself, of his improvement in the steam-engine: —

To all whom it may concern:

Be it known, that I, John Brown Emerson, of the city of New York, have invented certain improvements in the steam-engine, and in the mode of propelling therewith either vessels on the water or carriages on the land, and that the following is a full and exact description thereof.

One object of my improvement is to substitute for the crank motion a mode of converting the reciprocating motion of a piston into a continued rotary motion, by a new combination of machinery for that purpose.

This mode is applicable to an engine either with one or with two cylinders, and is carried into effect as follows. Alongside of the cylinder I place a shaft, the lower end of which may revolve in a step on the platform or foundation upon which the cylinder stands; in which case it must be somewhat longer than twice the length of the cylinder, as it must extend above it to a height somewhat greater than the length of the stroke of the piston. Sometimes, however, this shaft may have its lower gudgeon only a small distance below the upper end of the cylinders, whence it must extend above it as before. Its upper gudgeon must of course be sustained by a suitable frame. This shaft is to stand parallel to the piston rod, from which it is to receive its revolving motion. Upon the upper end of the shaft, above the top of the cylinder, there is to be placed a solid cylinder of wood, or of any other convenient substance, of such diameter as shall cause its periphery to come nearly into contact with the piston-rod for its whole length, when the piston is raised. The solid cylinder above described is to be made to revolve in the following manner. I make a groove in it, which commences near its lower end, and, passing spirally, extends half-way round it by the time it reaches nearly to the upper end, or to a distance vertically equal to the stroke of the engine; from that point it passes down around the opposite half, and returns into itself at the point of beginning. Upon the upper end of the piston, against its side, I place a friction-roller, which is to work in the groove in the solid cylinder; the piston-rod rising between parallel guide-pieces, by which it is kept in its proper place, and its tendency to turn round by the action of the roller in the groove is checked. When the piston is down, this friction-roller will stand in the V formed by the junction of the grooves on the opposite sides, and as it is raised, it will in its passage to the upper junction give half a revolution to the solid cylinder, and in descending will complete the revolution by the action of the friction-roller on the other portion of the groove.

When two cylinders are used, they are to be placed parallel to each other, and at such a distance apart that the pistons of each may, in like manner, act upon the solid cylinder; the piston of one being up when the other is down. The boiler, the steam-pipe, the valves for the admission and discharge of steam, and other appendages, may be similar to some of those already in use. From the revolving shaft, already described,

a rotary motion may be communicated to paddle-wheels, steam-carriages, or other objects. As it is my intention, in general, to place my cylinders and revolving shaft vertically, I communicate motion to the horizontal shaft of a paddle-wheel by means of bevel-geared wheels near the lower end, or at any convenient part of the shaft; and by similar gearing, carriages may be propelled upon rail or ordinary roads.

When used for steamboats, I employ an improved spiral paddle-wheel, differing essentially from those which have heretofore been essayed. This spiral I make by taking a piece of metal of such length as I intend the spiral propeller to be, and of a suitable width, say, for example, eighteen inches; this I bend along the centre so as to form two sides, say of nine inches in width, standing at right angles, or nearly so, to each other, and give to it, longitudinally, the spiral curvature which I wish. Of these pieces I prepare two or three, or more, and fix them on to the outer end of the paddle-shaft, by means of arms of a suitable length, say of two feet, more or less, in such a position that the trough-form given to them longitudinally shall be effective in acting upon the water. It must be entirely under water, and operate in the direction of the boat's way; instead of metal, the spiral propeller may be formed of wood, and worked into the proper form, — the shape, and not the material thereof, being the only point of importance.

Where a capstan is required, as on board of a steamboat, I allow the upper end of the vertical shaft before described to pass through the deck of the vessel, and attach the capstan thereto, so that it may be made to revolve by the action of the shaft, using such ray-wheels and falls to connect the shaft and the capstan as will allow of their being conveniently engaged and disengaged.

What I claim as my invention, and for which I ask a patent, is the substituting for the crank in the reciprocating engine a grooved cylinder, operating in the manner hereinbefore described, by means of its connection with the piston-rod, together with all the variations of which this principle is susceptible; as, for example, a bar of metal may be bent in the form of a groove, and attached to the revolving shaft, and friction-wheels on the piston-rod may embrace this on each side, producing an effect similar to that produced by the groove. I also claim the spiral propelling-wheel, contracted and operating in the manner in which I have set forth; and likewise the application of the revolving vertical shaft to the turning of a capstan on the deck of a vessel. Not intending, in either of these parts, to confine myself to precise forms or dimensions, but to vary them in such manner as experience or convenience may

dictate, whilst the principle of action remains unchanged, and similar results are produced by similar means.

JOHN BROWN EMERSON.

At April term, 1844, Emerson brought an action of trespass on the case in the Circuit Court of the United States for the Southern District of New York, against Hogg and Delamater, for an infringement of his patent-right. As one of the points decided by the court was whether or not the allegations of the declaration corresponded with the evidence of the patent, it is thought proper to insert the declaration. It was as follows, viz.: —

"John B. Emerson, a citizen of the State of New York, by Peter Clark, his attorney, complains of Peter Hogg and Cornelius Delamater, citizens of the same State, defendants, in custody, &c., of a plea of trespass on the case.

"For that, whereas the said plaintiff was the original inventor of a certain new and useful improvement, in the letters-patent hereinafter mentioned and fully described, the same being a certain improvement in the steam-engine, and in the mode of propelling therewith either vessels on the water or carriages on the land, which was not known or used before his said invention, and which was not, at the time of his application for a patent, as hereinafter mentioned, in public use with his consent or allowance. And the said plaintiff being so as aforesaid the inventor thereof, and being also a citizen of the United States, on the eighth day of March, one thousand eight hundred and thirty-four, upon due application therefor, did obtain certain letters-patent therefor, in due form of law, under the seal of the United States, signed by Andrew Jackson, then President, and countersigned by Louis McLane, then Secretary of State, bearing date the day and year aforesaid, whereby there was secured to him, the said plaintiff, his heirs, executors, administrators, or assigns, for the term of fourteen years from and after the date of the said patent, the exclusive right and liberty of making, using, and vending to others to be used, the said improvement, as by the said letters-patent in court to be produced will fully appear. And the said plaintiff further says, that the said defendants, well knowing the said several premises, but contriving, and wrongfully and injuriously intending to injure the plaintiff, and deprive him of the profits, benefits, and advantages which he might, and otherwise would, have derived and acquired from the making, using, and vending of the said invention or improvement, after the making and issuing of the said letters-patent, and within the term of fourteen years in said letters-patent mentioned, to wit, on the

first day of January, eighteen hundred and forty, and on divers other days and times between that time and the commencement of this suit, at the city of New York, and within the southern district of New York, wrongfully and unjustly, without the leave or license, and against the will, of the plaintiff, made and sold divers, to wit, ten machines for propelling boats, in imitation of the said invention and improvement, or a part of the said invention or improvement, to the benefit, use, and enjoyment whereof the said plaintiff was and is entitled as aforesaid, in violation and infringement of the said letters-patent, and of the exclusive right and privilege to which the plaintiff was and is entitled as aforesaid, and contrary to the form of the statutes of the United States in such case made and provided.

" And the said plaintiff further says, that the said defendant, well knowing the said several premises, but further contriving and intending as aforesaid, after the obtaining of the said letters-patent by the said plaintiff as aforesaid, and within the said term of fourteen years, to wit, on the said first day of January, eighteen hundred and forty, and at divers other times between that day and the commencement of this suit, within the southern district of New York aforesaid, wrongfully and unjustly, without the leave or license, and against the will, of the plaintiff, did make and sell divers, to wit, ten improved machines for propelling boats or vessels upon the water, constructed in a similar form and acting upon the same principle as the said machine or improvement, to the benefit, use, and enjoyment whereof the said plaintiff was and is entitled by his said letters-patent, as aforesaid, in violation and infringement of the exclusive right so secured to the said plaintiff by the said letters-patent as aforesaid, and contrary to the form of the statute in such case made and provided.

" And the said plaintiff further says, that the said defendant, well knowing the said several premises, but contriving and intending as aforesaid, after the obtaining of the said letters-patent by the said plaintiff as aforesaid, and within the said term of fourteen years, to wit, on the said first day of January, eighteen hundred and forty, and at divers other times between that day and the commencement of this suit, in the southern district of New York aforesaid, wrongfully and unjustly, and without the consent or allowance, and against the will, of the plaintiff, did imitate in part and make a certain addition to the said invention or improvement, to the benefit, use, and enjoyment whereof the plaintiff was and is entitled as aforesaid, in breach of the said letters-patent, and in violation and infringement of the exclusive right and privilege so secured to the

said plaintiff as aforesaid, and contrary to the form of the statute in such case made and provided.

"By means of the committing of which said several grievances by the said defendants, as aforesaid, the said plaintiff is greatly injured, and has lost and been deprived of divers great gains and profits which he might and otherwise would have derived from the said invention and improvement in the said letters-patent described and set forth, and in respect whereof he was and is entitled to such privilege as aforesaid, and was and is otherwise damnified to the damage of the said plaintiff of ten thousand dollars, and therefore," &c.

To this declaration, the defendants pleaded the general issue, and filed a copy of the special matters of defence to the action.

In May, 1847, the cause came on for trial. The patent was given in evidence, when the counsel for the defendants prayed the court to instruct the jury that the patent, thus produced in evidence by the said plaintiff, was void, for the reasons following : —

1. That the claim of the plaintiff, as set forth in his specification annexed to his letters-patent, embraces the entire spiral paddle-wheel; the claim is, therefore, too broad upon the face of it, and the letters-patent are void upon this ground, and the defendants are entitled to a verdict.

2. That the patent is void upon its face, for this, — that, purporting to be a patent for an improvement, and specifying that the invention is of "an improved spiral paddle-wheel, differing essentially from any which have heretofore been essayed," without pointing out in what the difference consists, or in any manner whatever indicating the improvement by distinguishing it from the previously essayed spiral paddle-wheels, it is wanting in an essential prerequisite to the validity of letters-patent for an improvement.

3. That the patent is void upon its face, for this, — that it embraces several distinct and separate inventions, as improvements in several distinct and independent machines susceptible of independent operation, not necessarily connected with each other in producing the result arrived at in the invention, and the subject-matter of separate and independent inventions.

4. It appears in evidence, that the drawing and model of the paddle-wheel of plaintiff, filed and deposited originally in the patent-office, had been lost by the destruction of that office in December, 1836, and that in restoring the record of the patent, under the act of March, 1837, the plaintiff sent from New Orleans to the office a new drawing, to be filed on the 5th of May, 1841, together with a court copy of the letters-patent which were deposited in the office. The drawing was not

sworn to by he plaintiff, but remained in the office till January, 1844, when it was delivered to an agent of the plaintiff and sent to New Orleans, and sworn to by him, and filed in the department on the 12th of February, 1844. On an examination subsequently by the plaintiff, it was discovered that this drawing was imperfectly made, and thereupon a second drawing was procured by him, which he claimed and offered to prove to be an accurate one, and was sworn to, and filed on the 27th of March, 1844, an authenticated copy of which was offered in evidence on the trial by the plaintiff; which was objected to by the counsel for the defendants, but the objection was overruled and the evidence admitted, to which an exception was taken.

5. That if from the evidence the jury are satisfied that no propelling-wheels were made by the defendants between the 27th of March, 1844, the date of the alleged completion of the record of the plaintiff's patent, under the act of March 3d, 1837, and the commencement of this suit in April following, that, upon this ground, the defendants are entitled to a verdict.

The court charged, in respect to the instructions prayed for, that "the claim of the plaintiff was for an improvement on the spiral paddle-wheel or propeller; that, by a new arrangement of the parts of the wheel, he had been enabled to effect a new and improved application and use of the same in the propulsion of vessels; that the ground upon which the claim is grounded was this: it is the getting rid of nearly all the resisting surface of the wheels of Stevens, Smith, and others, by placing the spiral paddles or propelling surfaces on the ends of arms, instead of carrying the paddles themselves in a continued surface to the hub or shaft. It is claimed that a great portion of the old blade not only did not aid in the propulsion, but actually impaired its efficiency, and also that the improved wheel is made stronger. It was made a question on the former trial, whether the plaintiff did not claim, or intend 'to claim, the entire wheel. But we understand it to be for an improvement upon the spiral paddle-wheel, claimed to be new and useful in the arrangement of its parts, and more effective, by fixing the spiral paddles upon the extremity of arms, at a distance from the shaft."

The court further instructed the jury, that "the description of the invention was sufficient, and that the objection, that the parts embraced several distinct discoveries, was untenable."

The court further charged, "that the damages were not necessarily confined to the making of the wheels between March, 1844, when the drawings were restored to the patent-office, and the bringing of the suit. Such a limitation assumes

that there can be no infringement of the patent after the destruction of the records, in 1836, until they are restored to the patent-office, and that, during the intermediate time, the rights of patentees would be violated with impunity." We do not assent to this view.

In the first place, the act of Congress providing for the restoration was not passed till 3d March, 1837; and, in the second place, in addition to this, a considerable time must necessarily elapse before the act would be generally known, and then a still further period, before copies of the drawings and models could be procured. Patentees are not responsible for the fire, nor did it work a forfeiture of their rights.

The ground for the restriction claimed is, that the community have no means of ascertaining, but by a resort to the records of the patent-office, whether the construction of a particular machine or instrument would be a violation of the rights of others, and the infringement might be innocently committed.

But if the embarrassment happened without the fault of the patentee, he is not responsible for it; nor is the reason applicable to the case of a patent that has been published, and the invention known to the public. The specification in this case had been published. It is true, if it did not sufficiently describe the improvement without the aid of the drawing, this fact would not help the plaintiff. If there had been unreasonable delay and neglect in restoring the records, and in the mean time a defendant had innocently made the patented article, a fair ground would be laid for a mitigation of the rule of damages, if not for the withholding them altogether; and the court left the question of fact as to reasonable diligence of the patentee or not in this respect, and also all questions of fact involved in the points of the case for the defendants, to the jury.

The counsel for the defendants excepted to each and every part of the charge of the court, so far as said charge did not adopt the prayer on the part of the defendants.

The verdict of the jury was, that the said Peter Hogg and Cornelius Delamater, the defendants, are guilty of the premises within laid to their charge, in manner and form as the said John B. Emerson hath within complained against them, and they assess the damages of the said plaintiff, on occasion thereof, over and above his costs and charges by him about this suit in this behalf expended, at one thousand five hundred dollars, and for those costs and charges at six cents.

The judgment of the court was, that the said John B. Emerson do recover against the said Peter Hogg and Cornelius Delamater his damages, costs, and charges in form aforesaid

by the jurors aforesaid assessed, and also three hundred and twenty-four dollars and fifteen cents, for his said costs and charges by the said court now here adjudged of increase to the said John B. Emerson, and with his assent; which said damages, costs, and charges, in the whole, amount to one thousand eight hundred and twenty-four dollars and fifteen cents.

The cause was argued in this court, in printed arguments, by *Mr. Upton* and *Mr. John O. Sargent*, for the plaintiffs in error, and *Mr. Morton* and *Mr. Cutting*, for the defendant in error. The arguments were too voluminous to be reported *in extenso*, and it is not possible, therefore, to give more than extracts from each.

The counsel for the plaintiffs in error assigned as errors the following points.

I. The defendant in error has no patent for an improved spiral paddle-wheel.

II. If the defendant's patent is for the combination of instruments described in the specification, there is no pretence that the combination has been infringed; if for several separate improved machines, it cannot be supported in law.

III. Defendant's patent is void for too broad a claim, and for not distinguishing his alleged improvement from other inventions, nor particularly specifying, as the statute requires, the particular improvement which he claims as his own invention or discovery. The case exhibits an improvement as the invention, and the claim is for the whole machine.

IV. The drawing filed March 27th, 1844, was not legal evidence of defendant's patented invention, because there was a drawing filed by the patentee on the 12th of February previous, which was, by the second section of the act of 1837, with his letters-patent, the only legal evidence of his invention, *as patented*, that could be offered in any judicial court of the United States.

V. — 1. The patentee, after an alleged correction of the record of his letters-patent, by filing the second drawing, could not, in law, avail himself of that alleged correction to cover by it alleged causes of action previously accruing; and in the absence of proof of any subsequent infringements, the plaintiffs here were entitled to a verdict below.

2. Nor was he entitled to recover damages for any alleged infringement prior to the alleged *completion* of his record by the filing of the corrected drawing of 27th March, 1844.

VI. What was reasonable time in this case for the restoration of defendant's patent to the office, if not expressly fixed

by statute (act of 1837, sec. 2), was exclusively a question of law.

*Mr. Upton*, for plaintiffs in error.

I. This action was brought to recover damages from the defendants below, for their asserted infringement of an alleged patent of the plaintiff for "an improved spiral paddle-wheel"; and the first question to which the attention of the court is requested is one which is presented upon the face of the letters-patent, which constitute the basis of the action, and which are incorporated into the bill of exceptions; it is this: — Has the defendant in error any such patent?

If it be manifest to this court, upon an inspection of the record and an examination of the letters-patent, that he has no grant, as patentee, of "an improved spiral paddle-wheel," then it is submitted, that there is no escape from the necessity of reversing the judgment which has been rendered, awarding him damages for the invasion of such a grant. This necessity is in no manner affected, though it appear that the objection was not taken in the court below, either at the trial or upon a motion in arrest of judgment. It is sufficient if the defect be manifest upon the record; for it would be monstrous to contend that this court is powerless, in any case, to reverse the judgment, when it appears upon the record before them that the very foundation of the judgment is so incurably and fatally defective as to have been completely beyond the remedy of the party, though the objection were taken at the earliest possible stage of the proceedings. Authority can scarcely be necessary to sustain this position. But this court has decided, in the case of Slacum *v.* Pomeroy, 6 Cr. 221, that it is not too late to allege as error in the Supreme Court a defect which ought to have prevented the rendition of the judgment in the court below. "Had this error," say the court, "been moved in arrest of judgment, it is presumable the judgment would have been arrested"; and "there can be no doubt, that any thing appearing upon the record which would have been fatal upon a motion in arrest of judgment is equally fatal upon a writ of error." So also Garland *v.* Davis, 4 Howard, 131.

By the bill of exceptions it appears, that, upon the introduction in evidence of the letters-patent by the plaintiff, "the counsel for the defendants did insist before the said Circuit Court, on behalf of said defendants, that the said letters-patent so produced and given in evidence on the part of the said plaintiff, as aforesaid, were wholly insufficient as the basis of the aforesaid action and claim upon the said defendants." Now, by reference to the letters-patent (page 7 of the record), the

court will perceive that the grant to the patentee, upon the face of the letters, is for "an improvement in the steam-engine," and for that alone; that it was for that alone that he solicited a patent by petition; that it was of that improvement only that he made oath that he was the original and first inventor. Such is the grant, and so is it recorded; and the public would seek in vain upon the records of the patent-office for a patent to the plaintiff below for "an improved spiral paddle-wheel."

It will not be contended that the letters, standing alone, confer any title to such an invention. But it may be said, that, inasmuch as the patentee has described a paddle-wheel, and also an improved method of causing a capstan to revolve upon the deck of a vessel, as well as his improvement in the steam-engine, and claimed these, as well as his steam-engine, in his schedule annexed to the letters-patent, the grant must be construed to cover the paddle-wheel and the capstan, as well as the steam-engine, though it be in express terms for the steam-engine only, though it was for that alone that he solicited a patent, and it was that alone that he made oath he had invented. Were this doctrine maintainable, it is obvious that it would be wholly subversive of the policy of the law, which looks as well to the protection of the public as it does to the encouragement of inventors. That the schedule annexed to letters-patent forms a part of the patent, and that they are to be construed together, is undoubtedly well established. This is the English doctrine, as well as that of our own courts; and, by a careful investigation of the authorities, it will be perceived that Mr. Phillips, in his elementary work (pp. 224 *et seq.*), is mistaken in supposing that there is any conflict between them.

By these authorities it is decided, that the title of the invention, as contained in the patent, may be explained by its description in the specification, whenever such title is general, ambiguous, or uncertain; and the patent will be sustained in all cases, unless the patent indicate one invention, and the specification describe another and different invention. *American authorities.* — Phillips on Patents, 224, and cases cited; Sullivan v. Redfield, Paine, C. C. R. 442; Shaw v. Cooper; 7 Peters, 292, 315; Evans v. Chambers, 2 Wash. C. C. R. 125; Barrett v. Hall, 1 Mason, 476; Whittemore v. Cutter, 1 Gall. 437; Evans v. Eaton, Peters, C. C. R. 341. *English authorities.* — Godson on Patents, 108, 113, and cases; Neilson v. Harford, Webster, 312, and arg.; Rex v. Wheeler, 2 Barn. & Ald. 350; S. C., 3 Merivale, 629; Glegg's Patent, Webster, 117; Russell v. Cowley, Webster, 470; Househill v. Neilson, Webster, 679.

When Mr. Phillips says (Phillips on Patents, 225), that any defect in the title may be remedied by the specification, what

he means is apparent by reference to the cases which he cites. The description comes in aid of a defective title, but never can create a new title, by adding to the grant.    There must be such a conformity between the title and the specification as that the former shall give some idea of the latter.    It is the description of the thing patented " which is made part of these presents," not a description of something else, of which the title of the grant gives no idea.

Thus reads the patent itself.    After reciting that John Brown Emerson had by petition solicited a patent for an improvement in the steam-engine, had made oath that he was the first and original inventor of said improvement, and paid the fee of thirty dollars into the treasury, it grants to him the exclusive right, &c., in the said improvement, "a description whereof is given in the words of the said John Brown Emerson himself, in the schedule hereunto annexed, and is made a part of these presents."    Then follows the caption of the schedule, thus : — " The schedule referred to in these letters-patent, and making part of the same, containing a description in the words of the said John Brown Emerson himself of his improvement in the steam-engine."

No reported authority can be found in the remotest degree sustaining the proposition, that a description and claim of any thing contained in a specification are covered by the grant, though the grant make no reference to it, and the title is so entirely distinct from it as to suggest no idea of the thing described.   Were this proposition tenable, then were we to strike out from this patentee's specification every word descriptive of his improvement in the steam-engine, leaving nothing but the comparatively few words descriptive of the spiral paddle-wheel and the improved capstan, the grant for the improvement in the steam-engine must be construed as a grant for an improved spiral paddle-wheel and an improved capstan.    Now, would it not be monstrous to contend that an instrument of so solemn a character as a government grant of letters-patent is to be added to and enlarged by construction ?

The doctrine as settled, upon every principle of construction, is the true doctrine ; — that the description of the thing patented, contained in the schedule annexed to the patent, constitutes a part of the patent, and may be and should be resorted to, in construing the patent, to control the generality of the title and to explain or elucidate ambiguities or uncertainties ; but that a description of a thing not indicated by the patent, not even remotely suggested by the grant or the title, can never be construed with the patent for the purpose of adding to or enlarging the terms of the grant.

That this doctrine may be made more obvious and conclusive, — if it be possible or desirable, — the court is referred to the provisions of the statute under which the letters-patent in this case issued.

The inventor is required to present his petition soliciting the patent, and to make oath that he is the inventor. The statute further requires that the letters-patent shall recite the allegations and suggestions of the petition, and give a short description of the invention. This requisition was obviously for the twofold purpose, 1st, that it might appear that the proper preliminary steps had been taken by the applicant, of which the recital in the letters was proof; and, 2d, that it might, on their face, be seen what was the nature and character of the grant. (Act of 1793, §§ 1, 3.) Now, did this patentee present his petition, soliciting a patent for an improved spiral paddle-wheel, and make oath that he was the inventor of that improvement? If it be answered that he did, then the positive requisition of the statute is not complied with, for the patent recites the allegations and suggestions of no such petition, and gives a short description of no such invention; and for this reason the patent would be absolutely void.

This is well established in the following cases : — Evans v. Eaton, Peters, C. C. R. 340; Kneiss v. Schuylkill Bank, 4 Wash. C. C. R. 9; Cutting et al. v. Myers, 4 Wash. C. C. R. 220; Evans v. Chambers, 2 Wash. C. C. R. 125.

If the letters-patent do recite the allegations and suggestions of the petition, then the patentee did not solicit a patent for "an improved spiral paddle-wheel" or an "improved capstan"; he did not make oath that he had invented these improvements, and hence the letters contain no description whatever of these improvements, and confer no grant of an exclusive right in them upon the patentee.

(The counsel then quoted largely from the opinion of Judge Washington in Evans v. Eaton, Peters, C. C. R. 340.)

II. At the trial, the defendants' counsel requested the court to instruct the jury, "that the patent of the plaintiff was void upon its face, for this, — that it embraces several distinct and separate inventions, as improvements in several distinct and separate machines susceptible of independent operation, and not necessarily connected with each other in producing the result aimed at in the invention, and the subject-matter of separate and distinct patents." The court charged the jury, that "the objection that the patent embraced several distinct discoveries is untenable." In this it is respectfully submitted that the court below erred.

(The counsel here cited and commented on Phillips on Pa-

Hogg et al. *v.* Emerson.

tents. "It is well settled, that two or more distinct machines, capable of independent operations, cannot be united in one patent." 3 Wheat. 454; 1 Mason, 447; 2 Mason, 112; 1 Story, 290.)

III. At the trial of this case, the counsel for the defendants requested the court to instruct the jury, "that the claim of the plaintiff, as set forth in his specification annexed to his letters-patent, embraces the entire spiral paddle-wheel; the claim is, therefore, too broad upon the face of it, and the letters-patent are void upon this ground." Upon this point the court charged the jury as follows: — "It was made a question on the former trial, whether the plaintiff did not claim the entire wheel; but we understand it to be for an improvement upon the spiral paddle-wheel, claimed to be new and useful in the arrangement of its parts, and more effective, by fixing the spiral paddles upon the extremity of arms, at a distance from the shaft."

IV. At the trial, the counsel for the defendants also requested the court to instruct the jury, "that the patent is void upon its face for this, — that, purporting to be a patent for an improvement, and specifying that the invention is of an improved spiral paddle-wheel, 'differing essentially from any that have heretofore been essayed,' without pointing out in what the difference consists, or in any manner whatever indicating the improvement by distinguishing it from the previously essayed spiral paddle-wheels, it is wanting in an essential prerequisite to the validity of letters-patent for an improvement." Upon this point the court charged the jury as follows: — that " the claim of the plaintiff was for an improvement on the spiral paddle-wheel or propeller, — that, by a new arrangement of the parts of the wheel, he has been enabled to effect a new and improved application and use of the same in the propulsion of vessels. That the ground upon which the claim is founded is this: it is the getting rid of nearly all the resisting surface of the wheels of Stevens, Smith, and others, by placing the spiral paddles or propelling surfaces on the ends of arms, instead of carrying the paddles themselves in a continued surface to the hub or shaft. It is claimed that a great portion of the old blade not only did not aid in the propulsion, but actually impaired its efficiency, and also that the improved wheel is much stronger." And the court further charged the jury, that " the description of the invention was sufficient."

Upon these two points, it is submitted that the court below erred. They are so connected, by reason of the peculiar circumstances of the case, that they will be presented and considered together, though they are distinct grounds of objection to the patent.

(The counsel then contended that the specification ought to be construed by itself, and be so clear as to be understood, without resorting to evidence or any other source of information, and cited: — *English authorities.* — McFarlane v. Price, 1 Starkie, 199; In re Nickels, Hindmarch on Patents, 186; Hill v. Thompson, 3 Merivale, 622; S. C., 8 Taunton, 325. *American authorities.* — Dixon v. Moyer, 4 Wash. C. C. R. 69; Evans v. Hettick, 3 Wash. C. C. R. 425; Lowell v. Lewis, 1 Mason, C. C. R. 189; Ames v. Howard, 1 Sumner, 482.)

This leads to the principle in the law of patents involved in the fourth point. It is the positive requisition of the statute, and has been repeatedly considered and passed upon by the federal judicial tribunals.

Before an inventor shall receive a patent, he is required, " in case of any machine, fully to explain the principle and the several modes in which he has contemplated the application of that principle or character, by which it may be distinguished from other inventions, and shall particularly specify and point out the particular improvement or combination which he claims as his own invention or discovery." The requisition of the English law is similar in this respect.

Now, before proceeding to consider whether the patentee, in this case, has complied with this positive and salutary requisition of the law, the attention of the court is requested to the reported cases in which the requisition has received judicial construction.

By a careful examination of these authorities, it will be found established, that, where a patent is taken out for an improvement, the specification must describe what the improvement is, and the patent be limited to such improvement; — if the patent includes the whole machinery, it includes more than the patentee invented, and is therefore void; — that if the patent be for an improvement in an existing machine, the patentee must, in his specification, distinguish the new from the old, and confine his patent to such parts only as are new, and if both be mixed up together, and a patent is taken for the whole, it is void; that, however the authorities may apparently vary in pointing out the particular manner in which the patentee must specify his improvement, and distinguish what he claims as new and his invention from what was old and before known, yet that they are in perfect harmony in deciding that he must do this in some manner, and upon the face of the specification. *American authorities.* — Evans v. Eaton, 3 Wheat. 454; Woodcock v. Parker, 1 Gall. 438; Whittemore v. Cutter, 1 Gall. 478; Odiorne v. Winkley, 2 Gall. 51; Lowell v. Lewis, 1 Mason, 182;

Barrett *v.* Hall, 1 Mason, 447; Sullivan *v.* Redfield, Paine, C. C. R. 441; Evans *v.* Eaton, 7 Wheat. 408; Dixon *v.* Moyer, 4 Wash. C. C. R. 69; Isaacs *v.* Cooper, 4 Wash. C. C. R. 261; Cross *v.* Huntly, 13 Wend. 385; Head *v.* Stevens, 19 Wend. 411; Ames *v.* Howard, 1 Sumner, 482; Kneiss *v.* Schuylkill Bank, 4 Wash. C. C. R. 9; Morris *v.* Jenkins et al., 3 McLean, 250; Peterson *v.* Woodler, 3 McLean, 248. *English cases.* — McFarlane *v.* Price, 1 Starkie, 199; Williams *v.* Brodie, Davies, Pat. Cases, 96, 97; Manton *v.* Manton, Davies, Pat. Cases, 349; Hill *v.* Thompson, 8 Taunton, 325; Minter *v.* Wells, 1 Webster, 130; Rex *v.* Nickels, Hindmarch on Patents, 186.

Now apply the rule of law, as prescribed by the statute and construed by these authorities, to the patent in this case. Admit that rule, as most liberally stated, in any reported decision, and the counsel respectfully asks, in what manner, upon the face of the patentee's specification, has he distinguished that which he claims as new, and his invention, from what was old and before known, or pointed out in what his improvement consists? It is most confidently answered, that he has done this in no manner whatever, neither expressly nor by implication, nor by any reference, and it is not in the wit of man to determine, upon the face of the specification, what the improvement is which the patentee claims or intended to claim. The court below, in their construction of the claim, in charging the jury, say, that the improvement consists "in a new arrangement of the parts." Does this appear, either in terms, or even impliedly, upon the face of the description? So far from this, the last words of the patentee, in his description, are, that the "shape" of the thing is the "only point of importance." The court further say, that this new arrangement of the parts consists in "getting rid of nearly all the resisting surface of the wheel of Stevens, Smith, and others, by placing the spiral paddles or propelling surfaces on the ends of arms, instead of carrying the paddles themselves in a continued surface to the hub or shaft."

Where, upon the face of the description, is there any mention made of Stevens's, Smith's, or of any previously invented wheel, save in the general declaration by the patentee, that his improved wheel "differs essentially from any which have been heretofore essayed," — a declaration which the court, in the case of Barrett *v.* Hall, above cited, declare to be "no specification at all"? And where, upon the face of the specification, is there the most remote allusion to the "getting rid of resisting surface"?

V. At the trial of the case, "it appeared in evidence that the

drawing and model of the paddle-wheel of the plaintiff, filed
and deposited originally in the patent-office, had been lost by
the destruction of that office in December, 1836, and that, in
restoring the record of the patent, under the act of March,
1837, the plaintiff sent from New Orleans to the office a new
drawing, to be filed on the 5th of May, 1841, together with a
court copy of the letters-patent, which were deposited in the
office.   The drawing was not sworn to by the plaintiff, but re-
mained in the office till January, 1844, when it was delivered
to an agent of the plaintiff, and sent to New Orleans, and
sworn to by him, and filed in the department on the 12th day
of February, 1844.   On an examination, subsequently, by the
plaintiff, it was discovered that this drawing was imperfectly
made, and thereupon a second drawing was procured by him,
which he claimed and offered to prove to be an accurate one,
and was sworn to and filed on the 27th day of March, 1844,
an authenticated copy of which was offered in evidence on the
trial by the plaintiff, which was objected to by the counsel for
the defendants ; but the objection was overruled, and the evi-
dence admitted, to which an exception was taken."

It is contended, that the Circuit Court erred in admitting in
evidence the second drawing of March 27th, 1844, and in sup-
port of this position, the following considerations are respect-
fully submitted.

(The counsel then urged, —

That the patentee had exhausted his privilege, when he
swore to the first drawing.

That, if allowed to file more than one, he might continue
to file them down to the day of trial.

That the first drawing became, by the statute, *primâ facie*
evidence of the invention, and there could not be two such.

That if this patentee had procured a re-issue of his patent,
under the third section of the act of 1837, he would not have
been entitled to the privilege which he now claims, and it is
unreasonable to suppose that Congress intended to give greater
privileges under one section than another.)

VI. At the trial of this case, the counsel for the defendants
requested the court to instruct the jury as follows : — " that if,
from the evidence, the jury are satisfied that no propelling-
wheels were made by the defendants between the 27th of
March, 1844, — the date of the alleged completion of the rec-
ord of the plaintiff's patent, under the act of March 3d, 1837,
— and the commencement of this suit in April following, that,
upon this ground, the defendants are entitled to a verdict."

The court refused to grant this prayer, and left it, as a
question of fact, for the jury to say, whether there had or had

not been unreasonable delay on the part of the patentee in restoring the record. Now, was this a question of fact? It is submitted, that it was not, but that, under the circumstances, it was purely a question of law, to be passed upon by the court.

The record shows, that, from the burning of the patent-office, in December, 1836, up to the month of May, 1841, no step whatever was taken by the patentee to restore the record of his patent, and that he then delayed to complete the record until the month of February, 1844. Of course, there could have been no dispute as to the fact in connection with the question of reasonable or unreasonable diligence. Now, the authorities are clear in establishing this doctrine, — that, when there is no dispute as to the facts, the questions of reasonable or unreasonable time, or delay, or diligence, are questions of law for the court, and not of fact for the jury. The following cases are referred to: — Ellis *v.* Paige, 1 Pick. 43; S. C., 2 ib. 71, 77, note; Gilbert *v.* Moody, 17 Wend. 354; Reynolds *v.* Ocean Ins. Co., 22 Pick. 191; Livingston & Gilchrist *v.* Maryland Ins. Co., 7 Cr. 506.

And now as to the charge of the court, that " the damages were not necessarily confined to the making of the wheels between March, 1844, when the drawings were restored to the patent-office, and the bringing of this suit." Is not this error? Why was the drawing of March 27th, 1844, filed in the patent-office? For the reason only, as avowed, that the drawing of February preceding was incorrect and defective. For the reason only, that the public had no notice, or, what is still worse, that the public had an imperfect and deceptive information, by the first drawing of the particulars of the patentee's invention. Would it not be monstrous to allow a patentee to recover damages for an alleged infringement made at a time when, by his solemn oath, he declares that the defendant was not notified of the character of his invention? — nay, more, when he swears, that, at the time of the alleged infringement, the only recorded notice of his invention, sworn to by himself, was imperfect, incorrect, and insufficient?

But by an examination of the grounds upon which the court rest their decision upon this question, it will be seen in what manner the error has arisen. The court say, the limitation contended for by the defendants " assumes that there can be no infringement of the patent after the destruction of the records in 1836, until they are restored to the patent-office; and that, during the intermediate time, the rights of patentees would be violated with impunity." With the greatest deference, it will appear, upon a consideration of the statute provisions, that the doctrine contended for involves no such assumption.

The second section of the act of 1837 provides for the very difficulty which is urged by the court as the sole objection to the limitation contended for. Foreseeing that some time must necessarily elapse before patentees could be informed of their rights and duties, and prepare copies of their patents and drawings and models, Congress has provided, in this section, that, from the 15th of December, 1836, when the patent-office was burned, to the 1st day of June, 1837, and not after, patentees and others may give in evidence their patents in any court, notwithstanding that they have not been re-recorded, and no verified drawing of the invention has been filed in the patent-office.

Is there not great danger, in the disposition to give the most liberal and enlarged interpretation to statute provisions for the protection and encouragement of inventors, that the rights of the public may be too much disregarded?

By the burning of the patent-office, something more was involved than the loss of the evidences of the rights of patentees. The public were thereby deprived of the only notice which the law recognizes of what they could and what they could not do, without being subjected to prosecutions for invasions of patent-rights. For the public, in the language of Judge Washington, in a case before cited, "can depend upon no other information, to enable them to avoid the consequences of litigation, than what the records may afford. No description of the discovery, secured by a patent, will fulfil the demands of justice and of the law, but such as is of record in the patent-office, and of which all the world may have the benefit."

Now Congress, in legislating to repair the loss of the patent-office, and to provide against its natural consequences, had in view the protection of the public, as well as patentees; and while, on the one hand, it was justly considered that patentees ought not to suffer by reason of a loss arising from no fault of theirs, on the other, it was as justly considered that the public ought not to suffer by reason of a too long delay on the part of patentees to furnish to the public anew the recorded descriptions of their inventions. Thus the second section of the act of 1837, saving the rights of patentees, enables them to recover damages for infringements after the burning of the patent-office, and down to the month of June, 1837, notwithstanding the non-existence of any public record of their inventions; but, saving the rights of the public, the statute gives no further time.

Is not this clear? And being so, is it not manifest that the court below erred in the instructions given to the jury upon this point?

Hogg et al. *v.* Emerson.

The drawing of a patentee, annexed to his patent, or referred to in his specification, constitutes a part of the patent, and oftentimes, as in this case, is the most material portion of the description, — without which the invention would be virtually undescribed. Now, when a patentee alters or amends his patent, whether in the *written* description or the *delineated* description, there is nothing better established than that he cannot recover damages for an alleged infringement committed prior to such amendment. The authorities to this point are conclusive, and in perfect uniformity; some of them, and those the most recent, going so far as to maintain that it makes no difference though the amendment be of a mere clerical error. In re Nickels, Turner & Phillips, 44; S. C., 1 Webster, 659; Hindmarch on Pat. (Eng. ed.) 216 *et seq.*; Wyeth *v.* Stone, 1 Story, 290; Woodworth *v.* Hall, 1 Minot & Woodb. 248, 389.

It is submitted, that a denial of the doctrine here urged on behalf of the plaintiffs in error would be equivalent to an abrogation of the provisions of the thirteenth section of the patent act of 1837, which declares that a patent can only be amended by a surrender and re-issue, and that the amended patent can only operate upon causes of action accruing subsequently to the amendment.

Construe the first section of the act of 1837 as the court below has construed it, and what is the consequence? A patentee, whose grant is dated on or before the 14th of December, 1836, may maintain actions for infringement of his rights from then to the present time, without any public record of his patent whatsoever being in existence during the entire period, provided he produces at the trial an authenticated copy of his patent and drawings from the patent-office, recorded there, perhaps, but the day before! From this consequence, it is submitted, there could be no escape, and small, indeed, would be the hope of escape for the innocent invader of the unrecorded right, with the question of reasonable diligence in the restoration of the record left to the decision of a jury.

*Mr. Morton* and *Mr. Cutting,* for the defendant in error.

I. The first point raised by the plaintiffs in error does not properly arise. The jury rendered a verdict for $ 1,500 damages. The amount in controversy being less than $ 2,000, the defendants below had no right to remove the cause to this court. They moved the Circuit Court for a new trial upon a case made, which motion was denied, and judgment was docketed upon the verdict. The defendants below then applied to the Circuit Court for the allowance of a writ of error, under the 17th section of the act of Congress, approved July 4, 1836,.

Hogg et al. *v.* Emerson.

which authorizes writs of error in patent cases to the Supreme Court of the United States, in the same manner, and under the same circumstances, as was then provided by law in other judgments and decrees of Circuit Courts, " and in all other cases in which the court should deem it reasonable to allow the same."

Having no right to a writ of error, therefore, unless the judges of the Circuit Court " should deem it reasonable to allow the same," application for the writ was made to the discretion of the court; and the application was granted so far as to allow the defendants to raise, for the consideration of the Supreme Court, five points specified by the court below, and which constitute the 2d, 3d, 4th, 5th, and 6th points now presented by the plaintiffs in error.* The defendants availed themselves of the permission to issue a writ of error, restricted as above stated, and now, after the writ has been allowed, they seek to argue a question not embraced in those specified by the court.

It is respectfully submitted, that this course ought not to be encouraged, and that the grounds discussed in the first point taken by the plaintiffs in error need not be considered by the counsel for the patentee. It may be briefly remarked, however, that the point referred to was not raised at the trial, and does not appear upon the face of the record, or even upon the bill of exceptions. It was insisted below, that the patent was void for the reasons specified in the bill of exceptions. The court will search in vain for the question attempted to be discussed by the counsel for the plaintiffs in error in his first point.

Even if it were raised by the bill of exceptions, and were a point that could be argued here, it would be untenable. The argument appears to be, that the patentee has no patent for " an improved paddle-wheel," because the title of the grant is for an improvement in the steam-engine, and the counsel for the plaintiffs in error argues as if the letters and the schedule were not part of the same instrument. By taking the whole patent together, that is, the letters and the specification, there can be

---

* Writ of error allowed in respect to the question: —

1. Whether the patent is void as embracing two or more distinct and independent inventions or improvements.
2. Whether the claim is for entire paddle-wheel, or only for an improvement.
3. Whether the new is sufficiently distinguished from the old.
4. Whether the corrected drawing was properly allowed and filed.
5. Whether the rule of damages was correct, on condition that case be submitted on written argument to Supreme Court at ensuing term, before 1st February, and judgment to be secured by filing the usual bond.

A copy of Judge Nelson's indorsement on petition for writ of error.
ALEX'R GARDINER, *Clerk*

no difficulty in ascertaining the extent of the patent. It grants to the patentee the right " of making, constructing, using, and vending to others to be used, the said improvement, a description whereof is given in the words of the said patentee himself in the schedule hereto annexed, and is made a part of these presents."

Thus the schedule is made a part of the patent, as much as if it were recited in the letters themselves. The grant is for the improvement described in the schedule, — and by referring to the schedule, the improved paddle-wheel is distinctly embraced as a part of the claim.

In the construction of patents, the schedule annexed must be always kept in view, and resorted to in order to ascertain what is the invention claimed and patented. If the claim or specification be more extensive than the actual invention, the patent may be void in part or in whole for that reason; but there can be no doubt that, *primâ facie*, the patentee has a grant for all that he claims in the schedule annexed to his patent. The description in the letters of the thing invented is always very brief, because it points to and incorporates the patentee's specification and description annexed, and which usually sets forth minutely the whole claim.

The argument on the other side, as to the effect of a variation between the title of the patent and the thing patented and described in the schedule, assumes that a good and perfect specification and description of the invention claimed by the patentee may be utterly defeated by a defect in the title, so that a specification and claim free from all ambiguity will be rendered utterly worthless by a defect in what the counsel terms " the title " of the patent. A rule of construction so harsh and unreasonable would be most destructive in its consequences. If applied to the interpretation of statutes, it would nullify many of them that are free from doubt; not many of the acts of Congress would stand, if defective titles were declared to be fatal to the laws themselves.

The patent act of 1793, section first, provides that the Secretary of State may cause letters-patent to be granted, " giving a short description of said invention or discovery." When the patentee presents his specification, it is referred to in, and made a part of, the patent, and it is from the patent, with schedules and drawings taken together, that it is to be determined what thing is intended to be patented. Pitt *v.* Whitman, 2 Story, 621. Any defect in the title is remedied by a proper description in the schedule. Barrett *v.* Hall, 1 Mason, 477; Whittemore *v.* Cutter, 1 Gall. 437; Phill. Pat. 224, 225.

In England, the rule appears to be different. There the patent is distinct from the specification, and controls it in construction, so that the patentee cannot cover any thing by the specification which is not embraced in the patent. Campion *v.* Benyon, 3 Brod. & Bingh. 5; The King *v.* Wheeler, 2 Barn. & Ald. 345.

II. But the plaintiffs insist, that the patent "is void, for the reason that it embraces several distinct and separate inventions, as improvements in several distinct and independent machines susceptible of independent operation, not necessarily connected with each other in producing the result arrived at in the invention, and the subject-matter of separate and independent inventions."

It is clear from the specification, that the patentee claims to have discovered an improvement in the steam-engine, and with it, in the mode of propelling vessels. He substitutes for the crank motion a mode of converting the reciprocating motion of a piston into a continued rotary motion, by a new combination of machinery for that purpose. From the revolving shaft described by him, a rotary motion may be communicated to paddle-wheels or other objects. When used for steamboats, the patentee employs the improved paddle-wheel described by him, which is necessarily to be worked in connection with the other machinery. When a capstan is required, as on board of a steamboat, he describes the mode of connecting the shaft of the engine with the capstan, so that it may be made to revolve by the action of the shaft; and he claims as his invention the substituting for the crank, in the reciprocating engine, a grooved cylinder, operating as described; the paddle-wheel constructed and operating as set forth; and the application of the revolving vertical shaft to the turning of a capstan.

Now it is manifest that the invention is a mechanical unity. The improved engine and paddle-wheel are intended to act together, and if a capstan be used, the improved engine is made to connect with and turn the capstan, as it does the paddle-wheels. Although the engine may be applied to the old-fashioned wheel, and though it may or may not be attached to the capstan, yet it is manifest that the improved engine connected with the paddle-wheel, or with a capstan, may be used in connection to produce or aid the result designed by the patentee, viz. the propulsion or navigation of a vessel.

(The remainder of the argument upon this head is omitted.)

III. The defendants prayed the court to instruct the jury, "that the claim of the plaintiff, as set forth in his specification annexed to his letters-patent, embraced the entire spiral paddle-wheel; that the claim was, therefore, too broad upon the face of it, and the letters-patent were void upon that ground.

The court charged the jury, that "it was made a question on the former trial, whether the plaintiff did not claim or intend to claim the entire wheel; but we understood it to be for an improvement upon the spiral paddle-wheel."

The counsel for the plaintiffs in error supposes that the court below arrived at this conclusion, not from the face of the patent, but from matters dehors the specification. This assertion is unfounded. The view of the court below is the result of a just construction of the patent itself.

It is difficult to perceive by what course of argument the patent can be shown to be too broad upon its face. By the expression "too broad," I presume, is intended that the patentee claims more than he has invented. This is usually a question of fact, dependent upon the proofs at the trial. The face of this patent certainly does not disclose the fact, that the patentee has a grant for any thing of which he does not claim to have been the inventor. The counsel for the plaintiffs has not discussed this point, except so far as his observations under his fourth point may be applicable to it; and it is therefore not deemed necessary here to enlarge further upon this branch of the case, except to observe that the patentee does not claim to be the inventor of "paddle-wheels," nor of "wheels acting on the spiral or screw principle"; on the contrary, he refers to wheels previously "essayed," upon which wheels the patentee claims to have improved. What he does claim, then, is an improved spiral propelling-wheel, constructed and operating under water in the manner described, which improvement, as described in the schedule, is new, and is the invention of the patentee.

IV. It is insisted, that the court below ought to have charged the jury as prayed for; namely, "that the patent is void upon its face for this, — that, purporting to be a patent for an improvement, and specifying that the invention is of an improved spiral paddle-wheel, differing from any which have heretofore been essayed, without pointing out in what the difference consists, or in any manner whatever indicating the improvement by distinguishing it from previously essayed spiral paddle-wheels, it is wanting in an essential prerequisite to the validity of letters-patent for an improvement."

The court refused so to charge, and held that the description of the invention was in this respect sufficient.

The point now raised is one purely technical, because it must be assumed after verdict, and upon the bill of exceptions, that the patentee was the real inventor of what he claims; that de facto he has not claimed as new that which had been known before; that the improvement is useful, and that the specification is so full and clear, and free from ambiguity, that

any mechanic skilled in the art of making propellers could, by following it, construct the thing patented.

But however meritorious the invention may be, yet it is contended that the patent ought to be adjudged void, because it does not point out the difference between the improved propeller and all other propelling-wheels previously essayed.

The object of pointing out the old from the new is, that the public may be informed what the party claims as his invention, and may ascertain if he claims any thing in common use.

The law does not require that he should describe the various paddle-wheels then known, or point out the differences between them and his improvement; such a rule, even if practicable, would be too onerous to be endured. Take, for example, a patent for an improvement upon all stoves previously essayed; it would be unreasonable to prescribe that the specification should describe all the stoves in use, or that had ever been essayed, and that it should point out the difference between them and the particular improvement; such requirement would be impracticable. When Emerson applied for his patent, in 1834, there were a very great number of paddle-wheels and propellers known, or which had been essayed, many of which had been patented in this country and in England. Now, it was not necessary for him to have described all these various wheels and propellers. It is enough if he has specified his own improvement; and if he has done so in an intelligible form, his patent is good on its face, although, when tested by evidence dehors the patent, it might appear that he has claimed what was old, and thus his patent might be defeated.

In Evans v. Eaton, 7 Wheat. 435, the rule is thus expressed: — "We do not say that the party is bound to describe the old machine, but we are of opinion that he ought to describe what his own improvement is, and to limit the patent to such improvement. The law is sufficiently complied with by distinguishing in full, clear, and exact terms the nature and extent of his improvement only."

Most of the authorities cited by the counsel for the plaintiffs in error, under his fourth point, are referred to by Phillips, in his work on Patents, and the rule that he deduces from them is thus stated, at page 269: —

"In specifying an improvement in a machine, it is often necessary to describe the whole machine as it operates with the improvement, in order to make the description intelligible, and enable an artist to construct the machine, as the inventor is bound to do in his description, and which if he fails to do, he falls into the fault of obscurity; on the other hand, if the whole

machine, as well the old as the new part, be thus described, it is requisite to distinguish what part the patentee claims, since, if this does not satisfactorily appear, the patent will, as we have seen, be void for ambiguity; or if the obvious construction is, that he claims the whole machine in its improved state, the patent will be void by reason of the patentee's claiming too much. The mode of expression generally used in the books, in relation to this subject, is, that the specification must distinguish the old from the new. The only object of this distinction is, however, to specify what the patentee claims, and the mere discrimination of the new from the old would not necessarily show this, for perhaps he does not claim all that is new. When the cases say, therefore, that the specification must distinguish the new from the old, we must understand the meaning to be, that it must show distinctly what the patentee claims, the only object of this distinction being for this purpose. This doctrine is illustrated by some of the cases already stated, and it runs through them all wherein this question arises."

Most of the patents describe the improved machine only, as will be seen by referring to the specifications in the patent-office, and to the reports of patent cases.

It has been, of late years, the practice of the courts of this country to give effect to patents, if possible, rather than to destroy them; and to this end, mere technical objections are no longer encouraged. The rigorous rules of the English courts, and of some of our earlier cases, by which meritorious patents were frequently overturned, have given place to more liberal and enlightened principles.

(The remainder of the argument upon this head is omitted.)

V. The authenticated copy of the corrected drawing, filed in the patent-office on the 27th of March, 1844, was correctly admitted.

The original drawing, filed with the patent in 1844, had been destroyed by fire; the patentee could not of course produce the original, and he therefore resorted to the next best evidence that the nature of the case permitted; this consisted of a copy which the plaintiff below offered to prove to be an accurate copy of the original; and this copy so offered was duly authenticated in the manner provided by the first and second sections of the act of March 3, 1837.

Upon the strictest principles of the law of evidence, the plaintiff below was entitled to prove what the original drawing really was. The original being lost, the next best evidence of it was an exact copy, proved to be accurate.

This proof would have been admissible and proper, irrespect-

ive of the act of 1837, and whether the copy so offered was a
record of the patent-office or not.  Suppose the act of 1837
had never been passed, and the plaintiff had proved the destruc-
tion of the original drawing, he might have produced upon the
trial a copy of it; and after proof that it was a true copy, he
would have entitled himself to read it in evidence.

But there can be no reasonable doubt that the corrected
drawing, filed on the 27th of March, 1844, was properly re-
ceived by the patent-office, and that an authenticated copy
thereof was admissible as evidence under the provisions of the
act of 1837.

That act was remedial in its character; its object was to re-
store the records, and to repair the loss occasioned by the fire.
To that end, it was of the highest public importance that the
specifications and drawings should be correctly and accurately
restored.  To have received imperfect or inaccurate copies
would have increased, and not have remedied, the mischief, and
to assert that the patent-office had exhausted its power to re-
store models and drawings by the reception of what were not
copies or true representations of the originals would be to give
a construction to the statute that would defeat its object.

The first section declares, " that it shall be the duty of the
commissioner to cause the copies offered by the patentee, or
any authenticated copy of the original record, specification, or
drawing, which he may obtain, to be transcribed," &c.  It is
not only within the powers of the department to receive cor-
rected drawings or models, in place of those that prove to be
inaccurate or imperfect, but it is the duty of the commissioner
to obtain exact substitutes for the originals, if possible; and if
those already filed are shown to be erroneous, imperfect, or un-
true delineations of the originals, it is the duty of the commis-
sioner to replace them with corrected copies.  In this way only
can the objects of the act be accomplished.  To deny this
power would be to perpetuate errors.

VI. The court below properly refused to charge the jury
that the defendants were not entitled to a verdict, if they were
satisfied that no propelling-wheels were made between the 27th
of March, 1844, and the commencement of the suit.

The defendants excepted to the charge so far only as it did
not adopt the prayer insisted on by them.

The prayer upon this point insists that the defendants were
entitled to a verdict, if no wheels were made by them after the
27th of March, 1844, no matter how often they had infringed the
plaintiff's patent prior to that date.  It assumes that all persons
may, with impunity, infringe upon all or any patents interme-
diate between the destruction by fire of the records of the patent-

office, and the complete restoration of them under the act of 1837. If the principle contended for be sound, then the patentee has no remedy for wilful and deliberate violations of his patent committed intermediate the destruction of the records of the patent-office and the complete restoration of them, no matter how public and notorious the patent may have become, and no matter how extensively the patent may have been published and circulated in works of art or otherwise.

This principle cannot be sound; and the defendants' prayer and exception raise no other question. The prayer assumes the broad ground, that there is no liability for infringements committed prior to the restoration, not only of the patent itself, but of the drawings, and that the patentee is not entitled even to nominal damages.

The patent, in the present case, had been restored and recorded anew long before the 27th of March, 1844, namely, in the year 1841; the recorded copy of the specification and claim was correct, and disclosed the patentee's right; and yet the court was asked in effect to charge the jury, that infringements might be perpetrated with impunity at any time after the fire, and at any time after the recording anew of the letters and schedule, until the 27th of March, 1844. The letters-patent were published in the Franklin Journal in 1834, were filed anew in 1841, and of themselves were sufficient to protect the patentee, even if the restoration of the drawing had been imperfect.

The views of the learned judge in his charge need no illustration; he charged the jury as favorably for the defendants as they had a right to request.

The complaint of the counsel for the plaintiffs in error, that the court left the question of unreasonable delay, on the part of the patentee, in taking measures to restore his records to the jury, is not properly urged, upon the present writ of error, because, —

1. It is not one of the five points that the court below allowed to be raised.

2. That part of the charge was not excepted to at the trial, and, on the contrary, the exception was limited to the point taken in the defendant's prayers.

3. Even if this point were properly before the court, it is clear that the question whether the patentee had been guilty of unreasonable delay and neglect in restoring the records was a question of fact upon the evidence then before the court.

It was a question of fact, submitted to the jury for the benefit of the defendants below; for if there had been such neglect or delay, the court instructed the jury, that, if the defend-

ants had innocently made the patented article, it would be a fair ground for a mitigation of the rule of damages, if not for the withholding them altogether.

The charge was as favorable to the defendants as the law and the evidence would permit.

*Mr. John O. Sargent,* for the plaintiffs in error, in reply and conclusion.

It is objected to the first point raised by the counsel for the plaintiffs in error, that it is not properly presented to the court, though it is admitted to arise upon the record. The argument is, that the court below intended to restrict the plaintiffs to the consideration of certain specified questions. True it is, that the court struck out from the bill of exception several points on which the plaintiffs relied; but the object of the court in so doing is misapprehended. It was the purpose of the court merely to disembarrass and relieve the record of objections which they considered ill-taken, and the discussion of which they deemed unnecessary. That, besides this limitation, of which the plaintiffs have not complained, it was the intention of the court to cut them off from their right of dealing with this record according to law, is not to be presumed or implied. No doubt whatever is entertained by the counsel for the plaintiffs, that the objection is well raised on the record, and that it is fatal to the defendant's claim.

I. The point made is, that the defendant in error has no patent for an improved spiral paddle-wheel.

The learned counsel for the defendant is mistaken in supposing that the argument of plaintiffs' counsel proceeds upon the idea, that the letters-patent and the specification are not parts of the same instrument. The specification forms a part of the patent, and they are to be construed together, but construed with reference to the fundamental principle of interpretation, *Quoties in verbis nulla ambiguitas, ibi nulla expositio contra verba fienda est,* — or, as it is sometimes laid down in the books, "No construction shall be made contrary to the very express words of a grant."

In construing this instrument, we must look to the situation of the parties, and the mode in which it was prepared. The formal letters-patent speak the language of both parties. In the instrument of grant, there is nothing equivocal or ambiguous. It is not capable of being misunderstood. No ingenuity can extort a double meaning from it. Mr. Emerson made oath that he was the inventor of an improvement in the steam-engine; solicited a patent for said improvement; received a patent reciting the exclusive privileges vested in him in said

improvement, and making the description of said improvement contained in the schedule annexed a part of his patent. All this must be taken as absolute truth. The patentee claiming under this instrument is bound by its recitals, and estopped from denying any thing that it alleges. The letters-patent, in fact, are the joint production of the grantor and grantee. The Secretary of State adopted the description of his improvement which the grantee furnished in his petition. The entitling of the schedule is debatable ground. This may have been the work of the grantee alone, or of a clerk in the department. In either event, it indicates the intention of the parties, and, as if to exclude the possibility of the grantee's taking an exclusive privilege to any other thing than that contemplated and expressed in the patent, the heading or title of the schedule recites, in effect, that said schedule is made a part of the patent, so far as it contains a description of the improvement in the steam-engine, and no farther.

The language of the parties indicates plainly enough what was intended to be granted, and what was actually granted. Then comes the descriptive part of the schedule, or the specification, in the words of the grantee alone. This contains a particular description of the improvement in the steam-engine secured by the patent. It then describes an application of this improved engine to turn the capstan on the deck of a vessel; and an improved spiral paddle-wheel, alleged to differ materially from those previously essayed. Now, the ground taken by the counsel who opened this case is simply this, — that Mr. Emerson cannot, by the introduction of new matters in his specification, make his patent operate as a grant for the improvement mentioned in his petition, oath, and letters; and also as a patent for other things not mentioned in such petition, oath, and letters. It is respectfully submitted, that such is clearly the law.

It is presumed that there is no difficulty in the court's taking judicial notice of any thing involved in the construction of a patent, which a judge at *nisi prius* would know without the aid of a jury. If this view is correct, the court will know that an improved steam-engine is not an improved paddle-wheel, and was not at the time this patent was issued. This being so, the improved spiral paddle-wheel is not only not in terms included in this patent, but is by legal implication as absolutely excluded from the patent as if it were excluded in express terms. In the fair, natural, obvious interpretation of this grant, collecting its meaning from the terms used in it, understood in their plain, ordinary, and popular sense, the improved steam-engine is the subject, and the sole subject, of Mr. Emer-

son's patent. Apply these principles, which, in the language of a learned and eminent judge, furnish a "rule of construction which applies to all instruments," and they establish beyond a question that Mr. Emerson has no grant for an exclusive privilege in a spiral paddle-wheel.

And, first, because the force of the schedule is thus restrained in express terms by the patent, and these terms are the language of both parties. Again, because the language of the schedule is throughout the language of the grantee alone, and binds the grantor only so far as it has been expressly, or by necessary implication, adopted by him. Now the duty of the Secretary of State, under the act of 1793, was purely ministerial. He took no such judicial cognizance of specifications as is now rigidly exercised by the commissioner of patents. The grantee might have included many distinct machines in his schedule, and the Secretary of State was not called upon to notice the fact, did not notice it, and could not have prevented it. The patent was within his control, and the schedule so far as it was made a part of the patent, but not otherwise. He could so far restrict it as to limit its effect to the description of the thing patented, and to that extent he did in fact, in express terms, limit it. Beyond this he had no jurisdiction. The same is true of the Attorney-General. It was his duty merely to see that the patent purported to embrace but one improvement, and that the specification was signed by the patentee, and attested by two witnesses. His duty was then discharged, and he certified to the patent's being conformable to law. Now, is it not against reason, and therefore against law, to say that such a schedule, made by the grantee alone, and not examined by the grantor, is in any other respect, and to any greater extent, operative in conferring exclusive privileges, than it is made so by the mutual assent of the parties, expressed in their common and joint language in the patent itself? Can such recklessness and improvidence in the issue of its grants as a different construction would establish be attributed to any government? If the schedule had contained the specification of a spiral paddle-wheel alone, would it have been patented under the terms of this grant? Would the patentee in that case have complied with that provision of the statute of 1793, which required him to "recite" his invention in his petition? Would his oath to the invention of an improved steam-engine then have covered the invention of a spiral paddle-wheel? And if not in that case, why in this? Does the mere fact of describing the improved steam-engine in the schedule incorporate in this patent an improved paddle-wheel, which would not have been incorporated if the improved steam-engine had been

omitted altogether? If such is the construction to be put upon these instruments, the Secretary might as well have issued his letters-patent in blank, and suffered individuals to fill them up at their pleasure. The petition, the oath, the description, the grant, the signing by the Secretary and President, the reference to the Attorney-General, were all superfluous. But, say the counsel for the defendant in error, the schedule is a part of the patent, and if the schedule contains a description and claim of a machine, that machine becomes the subject of the exclusive privileges granted by the patent, just as much as if the inventor had petitioned for, sworn to, paid for, and received a patent for the same. This understanding of the matter would have been a very convenient one for a patentee under the law of 1793, because it would have enabled him to include in his letters the inventions of others, without incurring the penalties of perjury; and as many of them as he pleased at the expense of a single fee. With all deference, but with all confidence, it is repeated, that the schedule is so far a part of the patent as it contains a description of the thing patented, and no farther. It is the description of the improvement patented contained in the schedule, which is the specification that forms a part of the patent. It is in this view that the language of the court is to be applied, when they say that the specification is a part of the patent, and that the whole is to be taken together, and construed as one instrument. As a general thing, under the law of 1793, the schedule contained only such a specification; in contemplation of law it never can contain any other: if it contains any thing more, the excess is surplusage. If it does not vacate the patent, it is at least inoperative, — it cannot enlarge the grant.

On the English cases there would be no doubt on this point. For the non-conformity between the title in the patent and the description in the specification, the patent would be declared void on two grounds: — 1st. For the false suggestion in the petition. 2d. For the claim in the specification of an improvement not within the true meaning and extent of the grant.

Either of these objections would render a patent in England absolutely void: — 1st. Because the crown has been deceived. 2d. Because the inaccurate title is calculated to deceive the public.

These consequences flow, not from any special provision in the English patents or statutes, but from principles of the common law applicable to all public grants. These principles apply with equal force to public grants of the United States, unless there is some provision in our patents as issued, or in

our statutes on this subject, rendering them inapplicable. It is submitted, with all deference, that no such provision can be found, and that the reasons for sustaining them in their full effect are stronger under the system established by our act of 1793, than under the English system.

(The remainder of the argument upon this head is omitted.)

II. It is again objected by the counsel for the defendant in error, that there is nothing in the exception to the ruling of the court in regard to the insertion of several claims for distinct and separate machines in the specification.

The case of the defendant is obviously very much distressed by this point, and his counsel protest strongly that the inventions described exhibit a "mechanical unity," being all a means of propelling vessels. To maintain this proposition they resort to a very extraordinary mechanical discussion, to show that, by means of the capstan, without regard to the motive power of the engine, they could propel a vessel. If this be so, and the counsel should present their argument to the commissioner of patents in the shape of a specification, they might readily obtain a patent for it if a new and useful invention. They think, if a vessel with Mr. Emerson's machinery on board should be becalmed, without fuel, that, by applying "the motive power" by manning the capstan, motion would thereby be communicated to the propeller. The answer to this is, that no such application is contemplated by the patentee; and to arrive at it the learned counsel is compelled to sever and destroy his mechanical unity, by leaving the steam-engine useless for the want of fuel.

The question is now, for the first time, distinctly presented to this tribunal, and the doctrine on this subject is to be settled by the judgment of the court in this case. It is a question of no inconsiderable public importance, and it is desirable that it should be adjudicated on plain and substantial grounds. All inventions are supposed to conduce more or less to one common object, to wit, the benefit of the public. This common purpose is probably too remote to sustain the introduction of all manner of inventions into the same patent; but, for all practical purposes, it is precisely as proximate and tenable as the common purpose claimed for the patentee in this case.

It is most humbly submitted, that the doctrine of this court, as suggested in Evans v. Eaton, is the true doctrine on this subject:—"On the general pa e t law a doubt might well arise whether improvements on different machines could regularly be comprehended in the same patent, so as to give a right to the exclusive use of the several machines separately, as well as a right to the exclusive use of those machines in combina-

tion." This language obviously contemplates a case in which the machines patented might be used in combination; and the whole force of Mr. Justice Marshall's very sound and pregnant suggestion is destroyed the moment the converse of the proposition is established, namely, that when machines are capable of being used in combination, then any number of them may be united in the same patent. The language of the court in the case cited applies only to the case where the machines in question are capable of acting together; withdraw such cases from the operation of the principle propounded by the court, and there is an end of it. And yet this doctrine, as laid down by the court in that case, is daily acted upon by the patent-office, under the act of 1836; and if it is materially shaken or qualified, the revenues of the department will be very seriously diminished.

The suggestion in Evans *v.* Eaton, on this point, was much considered in Barrett *v.* Hall, and it may be said that no cases on record present more masterly expositions of the principles of patent law which they discuss. Wyeth *v.* Stone stands on the extreme verge of sound principle; but there the two instruments were in fact but part of one and the same machine. The instruments contemplated in that case formed a compound machine for cutting ice. They were, in fact, but parts of one and the same instrument. Two things cannot be readily imagined more absolutely distinct and separate instruments, than a steam-engine and a paddle-wheel. A steam-engine is employed to give motion to every manner of machinery. A paddle-wheel may be turned by horse-power, or man-power, or windmill-power, as well as by a steam-engine. Here the engine is the motive power; the wheel is the thing moved. The engine might be well employed to move any thing else; the wheel might well be put in action by any other motive power. They are as distinct and separate as cause and effect, and cannot be united in one patent, except upon principles that would entirely nullify the rule of law laid down in Evans *v.* Eaton and Barrett *v.* Hall, and admit of the introduction in the same patent of entirely distinct and separate machines.

It is suggested, that a different doctrine from that contended for by the plaintiffs prevails in England. We have cited no English authorities on this point. It arises on our own statutes, and is so rested by Mr. Justice Marshall.

There is no hardship in the rule contended for. In no other way can the subject-matter of an invention be distinctly brought out, so as to warn the public against undesigned infringements. If several machines can be mixed up in one specification, and several improvements on each, and then patented in the name

of one of those machines, it is respectfully, but earnestly, insisted, that the patent-office cannot fail to become the source of more oppression and outrage than will be long tolerated by a people who are masters of their own institutions. Under such an understanding of the law, letters-patent will be regarded by the public as mere charters of iniquity, and the whole system must be swept away. It must be as impracticable to sustain such an institution in the United States as it would be to establish the Inquisition here, or vest in the government those odious prerogatives the abuse of which led to the English statute of monopolies.

It is most humbly submitted, then, that, on the authorities and on the reason of the case, there was error in the charge of his honor, the circuit judge, that "the objection that the patent embraces several distinct discoveries is untenable."

III. Counsel for the defendant in error cannot perceive by what course of argument this "patent" can be shown to be too broad upon its face. We are embarrassed somewhat in reasoning upon this case, because it is an anomaly. This is the first attempt on record to sustain a grant of an exclusive privilege by virtue of letters-patent which contain no allusion whatever to the alleged subject-matter of the privilege which is set up under them. We repeat, and to this point pray the special attention of the court, that, among the many hundred patent cases that have been adjudicated in this country and in England, not one such case is reported. In discussing analogies, therefore, we must waive for the time the great difference between this and all other cases, arising from the fact that the patent before us contains no grant of an exclusive privilege in a spiral paddle-wheel.

Plaintiffs' counsel do not allege, therefore, that this patent is too broad upon its face. It is as broad upon its face as the law will allow. It is broad enough to cover an improved steam-engine, and no more broad. It is made void by attempting to include more in the specification than is included in the grant, and more in the claim than is shown to be of the patentee's invention. The objection of plaintiffs' counsel is, that the claim is broader than the invention.

The claim is for the entire spiral paddle-wheel, constructed and operating as set forth; and more than that, it is for such a machine "not confined to precise forms or dimensions, but varied as experience or convenience may dictate, whilst the principle of action remains unchanged, and similar results are produced by similar means."

Here is a claim for the entire wheel, to be varied as the inventor may see fit to vary it, and for every other wheel operat-

ing on the same principle, and producing similar results by similar means. It is a claim, as broad and distinct as language can make it, for the spiral propelling-wheel, and every part of it, and for liberty to vary it in form as the inventor pleases, as long as a similar result — to wit, the propulsion of vessels — is produced by similar means, — to wit, by a spiral wheel. The result contemplated is propulsion ; the means or instrument is a spiral wheel, of such form as experience or convenience may induce the inventor to make, without changing the principle of action. Such is the claim ; and if the claim is a valid one, no man can effect the propulsion of a vessel on the principle of action contemplated by a spiral wheel, without invading Mr. Emerson's claim.

But, while such is the claim with which Mr. Emerson arms himself, and goes out among men, as Lord Kenyon expressed himself in a similar case, "hanging terrors over the unlearned," when we come to examine the specification of his wheel, we find an implied acknowledgment that it is only an improvement, and merely an implied acknowledgment. He speaks of an "improved spiral paddle-wheel," leaving the unavoidable inference, that he has improved the ordinary paddle-wheel by making it spiral, and that the spiral feature — or, as he subsequently describes it, his spiral trough — is the only material part of his improvement.

Here is the old defect, that has been decided over and over again to be fatal, — the invention of an improvement, and the claim of the whole machine. No ingenuity can withdraw this case from that large class of cases in which the rule we contend for has been laid down with a distinctness that cannot be mistaken, and applied with a wise, uniform, and unrelenting firmness. The courts say, that no man shall give that false color to his claim which may enable him to "hang terrors over the unlearned." The case before the court is Jessop's case, where the patent was for the whole watch, and the invention of a particular movement. It is the case presented in Williams v. Brodie, where the invention was an improvement on a stove, and the patent for the whole stove. It runs on all fours with Cross v. Huntley, where the invention was of an improvement in the washing-machine, and the claim was for the whole machine ; where the court did not hesitate, in an action where the patent came up collaterally, to declare it void. It is Bovile v. Moore, where the patent for an improvement on a lace-machine was held void, because the claim was for the whole machine, though a considerable part of it had been long in use.

There is no matter of fact to be found, in order to bring out this defect, that the law may be applied to it. It lies on the

face of the specification. Jessop, Williams, Cross, and Bovile showed that they had invented improvements, and claimed the entire machines. Emerson suggests that he has invented an improvement, and claims the entire machine. Where is the difference ? What subtilty can distinguish between these cases ? And why should we seek to establish thin, fine, and subtle distinctions, in a case where the policy of the law is so plain, obvious, and honest, and where the great end to be attained is to prevent patentees from "hanging terrors over the unlearned "?

These cases, it may be said, are not binding authorities upon this court. They are not so cited. No weight is claimed for them beyond that which they derive from their intrinsic good sense and sound reason. Their authority, as well-considered decisions, has never been judicially disturbed or questioned. But there is a case of controlling authority, — that of Evans v. Eaton, — sustaining the doctrine for which we contend to its full extent. To this case I shall have occasion again to refer, in considering the fourth head of the argument of the learned counsel for the defendant, to which I now pass.

IV. The fourth point discussed by the learned counsel for the defendant touches the second prayer made to the court below.

Plaintiffs contend that Mr. Emerson's specification does not define with precision the nature and extent of the alleged improvement in the spiral paddle-wheel, but describes the whole machine, and claims the whole as improved, without distinguishing the new from the old. A patent with such a specification cannot be supported. This doctrine rests so firmly on the authoritative decision of this court, that it may well be left to authority. We shall, therefore, merely allude to the obvious reason for it, which is, to limit the exclusive privilege to the actual improvement, and disarm the patentee of the power of "hanging terrors over the unlearned," and practising upon the fears and credulity of the public, by "pretending that his invention is more than what it really is, or different from its ostensible objects." If a patentee can mix up a single undefined improvement in details of the construction and operation of an old machine, and then claim the whole machine constructed and operating in the manner set forth, then a patent, instead of being merely the reward of meritorious invention, is a device to encourage litigation, extortion, and fraud. Such a patent shifts its grounds at every trial, changes its color according to the aspect in which it is presented or met, and adapts itself with a fatal elasticity to the length and breadth of the evidence which happens to be applied to it.

(The remainder of the argument upon this head is omitted.)

V. Now with regard to the drawings. It appears from the record (p. 10), that two drawings were filed by Mr. Emerson in the patent-office, under the act of 1837; one as early as 1841, which was re-filed, with the plaintiff's oath to its correctness, on the 12th of February, 1844, and the other, with the same oath, on the 27th of March, 1844. The second drawing was the one produced and relied on by the plaintiff below as constituting, with the letters-patent, that certified copy of the renewed record in the patent-office which the second section of the act last cited makes the only proof of the alleged patent admissible in any judicial court of the United States.

The learned counsel for the defendant in error suggest, that, after the original drawing was destroyed by fire, the next best evidence of it was an accurate copy of it, offered to be proved such. It is submitted, with great deference, that a drawing of Mr. Emerson's paddle-wheel, filed in March to lay the foundation of a suit in April, was not the next best evidence of the alleged original, for the reason that there was another drawing, previously filed and sworn to, which was something more than next best evidence of the lost original, being made by statute absolutely the only evidence of it that could be received in any judicial court of the United States. It might, indeed, be well contended, that the first-filed drawing did not at all partake of the character of secondary evidence. It became, by force of the statute, to all legal intent, the original drawing. It filled the place of the original drawing on the record, being verified by the same oath, vesting the same rights, construed in the same way as part of the specification, and conclusive proof of all that it purported to prove, until it should be rebutted. The letters-patent and first drawing filed by Mr. Emerson, under the first section of the act of 1837, became, by virtue of the second section, as far as the patentee was concerned, primary evidence. It was open to observation and impeachment to all the rest of the world; but by operation of the statute, in connection with well-established principles of law, it was at all events conclusive upon the patentee. The drawing, therefore, filed on the 27th of March, 1844, was not in law the "next best" evidence of Mr. Emerson's original drawing, because there was a prior drawing filed on the 12th of February, which the statute had expressly declared to be the legal original, at least for all purposes of litigation.

(The remainder of the argument upon this head is omitted.)

VI. On the question of damages, counsel for the defendant insist that there was no error in the charge of the learned judge, that "the damages were not necessarily confined to the

making of the wheels between March, 1844, when the drawings were restored to the patent-office, and the bringing of the suit." Such a limitation was prayed below, and, as it was supposed, on well-established principles of law and equity. It is again pressed, with all deference, but with perfect conviction, that the refusal of the prayer was error, for which the judgment under consideration ought to be reversed.

The patent act contemplates, that every thing to be done by an inventor, with respect to his specification and drawings, is to be done before the patent issues. There is no such thing as correcting the record of a specification or drawing by mere substitution of some other specification or drawing. After the patent issues, the patentee cannot, by merely depositing a new drawing, on any plea whatever, make it a part of his patent, or any evidence whatever of his invention, as originally patented, so as to cover cases of alleged infringement prior to such change in the record. There can be only one motive of desiring to add a new drawing, and that is, to remedy a defect or insufficiency in the original drawing or specification, or to correct the same. The object of such a change can never be merely to present a more tasteful drawing, or a drawing more agreeable to the eye, or more in conformity to pictorial rules. Other arts than the fine arts induce such an application. The offer to file a new drawing is an admission on the part of the patentee, that his new drawing covers something in which the original drawing is defective or insufficient. And, under these circumstances, what does the statute say ? That the patentee must surrender his patent, and that a new patent may issue in conformity with his corrected specification, and thereafter operate, for the residue of the original term, on the trial of all actions thereafter commenced for causes subsequently accruing, as though the same had been originally filed in such corrected form before the issuing out of the original patent. And in this case, the commissioner is not bound to grant such re-issue, nor can he grant it except in cases where the error has arisen by inadvertency, accident, or mistake; and without any fraudulent or deceptive intention. Similar proceedings may be had in regard to the addition of an improvement. (Act of 1836, § 13.)

(The remainder of the argument upon this head is omitted.)

It is respectfully submitted, then, —

1. Because the defendant in error has no grant of exclusive privilege in the machine, which is the subject-matter of the present controversy :

2. Because he could not in law receive a grant for it, as one of several distinct machines in the same patent:

3. Because, as the author of an improvement, he could not take out a valid patent for the whole machine :

4. Because he has, not in his specification distinguished between the old and new parts of his alleged improved machine, but has claimed the whole machine as improved :

5. Because he did not produce in evidence the record of his patent which the law had made such, but another record ; and,

6. Because he has recovered damages for causes of action accruing previously to the alleged correction of his record, and prior to the alleged renewal of it under the act of 1837 :

For all these reasons, and for others raised upon the exceptions and record in this cause, presented perhaps too much at length, but not more at length, in the view of counsel, than their public importance may justify, — that the judgment of the Circuit Court in this case ought to be reversed.

Mr. Justice WOODBURY delivered the opinion of the court.

This is a writ of error brought under some peculiarities which are first to be noticed.

It comes here by virtue of the 17th section of the general patent law of July 4th, 1836. (5 Statutes at Large, 124.)

That section grants a writ of error from decisions in actions on patents, as in ordinary cases, and then adds the privilege of it "in all other cases in which the court shall deem it reasonable to allow the same." This was doubtless intended to reach suits where the amount in dispute was less than $ 2,000, on account of the importance of the points sometimes raised, and the convenience of having the decisions on patents uniform, by being finally settled, when doubtful, by one tribunal, such as the Supreme Court.

The judges below, in this case, deemed it reasonable, that only a certain portion of the questions raised at the trial, concerning the validity of the patent, should come here, and the record was made up accordingly.

But the appellants contend for their right to bring here all the questions which arose in the case, and this is a preliminary point to be settled before going into the merits. The present is believed to be the first writ of the kind, which has given occasion for settling the construction of any part of the above provision ; and therefore, without the aid of precedent, after due consideration of the words and design of the statute, we have come to the conclusion, that the position of the plaintiffs in error, in this respect, is the correct one, and that when a court below deem it "reasonable" to allow a writ of error at all, under the discretion vested in them by this special provision, it must be on the whole case.

The word "reasonable" applies to the "cases," rather than to any discrimination between the different points in the cases.

It may be very proper for the court below to examine those points separately and with care, and if most of them present questions of common law only, and not of the construction of the patent acts, and others present questions under those acts which seem very clearly settled or trifling in their character, not to grant the writ of error at all. It might, then, well be regarded as not "reasonable" for such questions, in a controversy too small in amount to make the writ a matter of right to persons, if standing on an equal footing with other suitors. But we think, from the particular words used rather than otherwise, that the act intended, if the court allowed the writ as "reasonable" at all, it must be for the whole case, or, in other words, must bring up the whole for consideration.

We shall, therefore, proceed to examine all the questions made at the trial, which it is supposed are relied on, and are now before us on the original writ and a *certiorari* issued since.

Looking to the declaration, the action is for a violation of a patent for an "improvement in the steam-engine, and in the mode of propelling therewith either vessels on the water or carriages on the land."

The evidence offered at the trial was a patent for "a new and useful improvement in the steam-engine," "a description whereof is given in the words of the said John B. Emerson himself, in the schedule hereto annexed, and is made a part of these presents."

In the schedule annexed is described fully what he says he invented, viz., — "certain improvements in the steam-engine, and in the mode of propelling therewith either vessels on the water or carriages on the land."

The first question arising on this statement is, whether the evidence proves such a patent as is set out in the writ to have been violated by the respondents.

If the patent is to be ascertained from the letters alone, or rather from what is sometimes called their title or heading, without reference to the schedule annexed, the evidence is undoubtedly defective, as the writ speaks of a patent for an "improvement in the steam-engine and in the mode of propelling" vessels, &c., therewith, — while the letters themselves, in their title or heading, speak only of a patent for "a new and useful improvement in the steam-engine." But the schedule annexed and referred to for further description, after "improvement in the steam-engine," adds, "and in the mode of propelling therewith" vessels, &c.

It can hardly be doubted, therefore, that the improvement

referred to in the writ and in the letters-patent, with the schedule or specification annexed, was in truth one and the same.

Coupling the two last together, they constitute the very thing described in the writ. But whether they can properly be so united here, and the effect of it to remove the difficulty, have been questioned, and must therefore be further examined. We are apt to be misled, in this country, by the laws and forms bearing on this point in England being so different in some respects from what exist here.

There the patent is first issued, and contains no reference to the specification, except a stipulation that one shall, in the required time, be filed, giving a more minute description of the matter patented. (Webster on Pat. 5, 88; Godson on Pat. 6, App.) It need not be filed under two to four months, in the discretion of the proper officer. (Godson on Pat. 176.)

Under these circumstances, it will be seen that the patent, going out alone there, must in its title or heading be fuller than here, where it goes out with the minute specification. But even there it may afterwards be aided, and its matter be made more clear, by what the specification contains. They are, says Godson on Pat. 108, "connected together;" and "one may be looked at to understand the other." See also 2 Hen. Bl. 478; 1 Webst. Pat. R. 117; 8 D. & E. 95.

There, however, it will not answer to allow the specification, filed separately and long after, to be resorted to for supplying any entire omission in the patent; else something may be thus inserted afterwards which had never been previously examined by the proper officers, and which, if it had been submitted to them in the patent and examined, might have prevented the allowance of it, and which the world is not aware of, seeing only the letters-patent without the specification, and without any reference whatever to its contents. 3 Brod. & Bingh. 5.

The whole facts and law, however, are different here. This patent issued March 8th, 1834, and is therefore to be tested by the act of Congress then in force, which passed February 21st, 1793. (1 Statutes at Large, 318.)

In the third section of that act it is expressly provided, "that every inventor, before he can receive a patent;" "shall deliver a written description of his invention," &c.; — thus giving priority very properly to the specification rather than the patent.

This change from the English practice existed in the first patent law, passed April 10th, 1790 (1 Statutes at Large, 109), and is retained in the last act of Congress on this subject, passed July 4th, 1836 (5 Statutes at Large, 119).

It was wisely introduced, in order that the officers of the government might at the outset have before them full means to

examine and understand the claim to an invention better, and decide more judiciously whether to grant a patent or not, and might be able to give to the world fuller, more accurate, and early descriptions of it than would be possible under the laws and practice in England.

In this country, then, the specification being required to be prepared and filed before the patent issues, it can well be referred to therein *in extenso*, as containing the whole subject-matter of the claim or petition for a patent, and then not only be recorded for information, as the laws both in England and here require, but beyond what is practicable there, be united and go out with the letters-patent themselves, so as to be sure that these last thus contain the substance of what is designed to be regarded as a portion of the petition, and thus exhibit with accuracy all the claim by the inventor.

But before inquiring more particularly into the effect of this change, it may be useful to see if it is a compliance with the laws in respect to a petition which existed when this patent issued, but were altered in terms shortly after.

A petition always was, and still is, required to be presented by an inventor when he asks for a patent, and one is recited in this patent to have been presented here. It was also highly important in England, that the contents of the petition as to the description of the invention should be full, in order to include the material parts of them in the patent, no specification being so soon filed there, as here, to obtain such description from, or to be treated as a portion of the petition, and the whole of it sent out with the patent, and thus complying with the spirit of the law, and giving fuller and more accurate information as to the invention than any abstract of it could.

In this view, and under such laws and practice here, it will be seen that the contents of the petition, as well as the petition itself, became a very unimportant form, except as construed to adopt the specification, and the contents of the latter to be considered substantially as the contents of the former.

Accordingly, it is not a little curious, that, though the act of 1793, which is to govern this case, required, like that of 1790, a petition to be presented, and the patent when issued, as in the English form, to recite the "allegations and suggestions of the petition," (1 Statutes at Large, p. 321, sec. 1, and p. 110, sec. 3,) yet, on careful inquiry at the proper office, so far as its records are restored, it appears that, after the first act of 1790 passed, the petitions standing alone seldom contained any thing as to the patent beyond a mere title; sometimes fuller, and again very imperfect and general, with no other allegations or suggestions, or descriptions whatever, except those in the

schedule or specification. The only exception found is the case of Evans v. Chambers, 2 Wash. C. C. 125, in a petition filed December 18th, 1790.

Though the records of the patent-office before 1836 were consumed in that year, many have been restored, and one as far back as August 10th, 1791, where the petition standing alone speaks of having invented only "an easy method of propelling boats and other vessels through the water by the power of horses and cattle." All the rest is left to the schedule. Other petitions, standing alone, are still more meagre; one, for instance, in 1804, asks a patent only of a "new and useful improvement, being a composition or tablets to write or draw on"; another, only "a new and useful improvement in the foot-stove"; and another, only "a new and useful improvement for shoemaking"; and so through the great mass of them for nearly half a century. But the specification being filed at the same time, and often on the same paper, it seems to have been regarded, whether specially named in the petition or not, as a part of it, and as giving the particulars desired in it; and hence, to avoid mistakes as to the extent of the inventor's claim, and to comply with the law, by inserting in the patent at least the substance of the petition, the officers inserted, by express reference, the whole descriptive portion of it as contained in the schedule. This may have grown out of the decision of Evans v. Chambers, in order to remedy one difficulty there. Cases have been found as early as 1804, and with great uniformity since, explicitly making the schedule annexed a part of the letters-patent. Proofs of this exist, also, in our reports, as early as 1821, in Grant et al. v. Raymond, 6 Peters, 222; and one, 1st Oct., 1825, in Gray et al. v. James et al., Peters, C. C. 394; and 27 Dec. 1828, Wilson v. Rousseau, 4 How. 649.

Indeed, it is the only form of a patent here known at the patent-office, and the only one given in American treatises on patents. Phillips on Pat. 523. Doubtless this use of the schedule was adopted, because it contained, according to common understanding and practice, matter accompanying the petition as a part of its substance, and all the description of the invention ever desired either in England or here in the petition. Hence it is apparent, if the schedule itself was made a part of the patent, and sent out to the world with it, all, and even more, was contained in it than could be in any abstract or digest of a petition, as in the English form.

We regard this mode and usage on this subject, adopted so early here and practised so long, as not proper to be overruled now, to the destruction of every patent, probably, from 1791 to

1836; and this, too, when the spirit of all our system was thus more fully carried out than it could have been in any other way.

As this course, however, sometimes was misunderstood and led to misconstructions, the revising act as to patents, in July 4th, 1836, changed the phraseology of the law in this respect, in order to conform to this long usage and construction under the act of 1793, and required not in terms any abstract of the petition in the patent, but rather "a short description" or title of the invention or discovery, "correctly indicating its nature and design," and "referring to the specification for the particulars thereof, a copy of which shall be annexed to the patent." And it is that — the specification or schedule — which is fully to specify "what the patentee claims as his invention or discovery." Sec. 5. (5 Statutes at Large, 119.)

It was, therefore, from this long construction, in such various ways established or ratified, that, in the present patent, the schedule, or, in other words, the specification, was incorporated expressly and at length into the letters themselves, — not by merely annexing them with wafer or tape, as is argued, but describing the invention as an "improvement, a description whereof is given in the words of the said John B. Emerson himself, in the schedule hereto annexed, and is made a part of these presents." Hence, too, wherever this form has been adopted, either before or since the act of 1836, it is as much to be considered with the letters, — *literæ patentes*, — in construing them, as any paper referred to in a deed or other contract. Most descriptions of lands are to be ascertained only by the other deeds and records expressly specified or referred to for guides; and so of schedules of personal property, annexed to bills of sale. Foxcroft v. Mallett, 4 How. 378; 21 Maine, 69; 20 Pick. 122; Phil. on Pat. 228; Earle v. Sawyer, 4 Mason, C. C. 9; Ex parte Fox, 1 Ves. & Beames, 67. The schedule, therefore, is in such case to be regarded as a component part of the patent. Peters, C. C. 394, and Davis v. Palmer et al., 2 Brockenbrough, 301. The oath of Emerson, too, that he was inventor of the improvement, must thus be considered as extending to all described in the schedule, no less than the title; and this is peculiarly proper, when the specification is his own account of the improvement, and the patent is usually only the account of it by another, an officer of the government. Taking, then, the specification and letters together, as the patent-office and the inventor have manifestly in this instance intended that they should be, and they include what has long been deemed a part and the substance of the petition; and the patent described in them is quite broad enough to embrace what is alleged in the writ to have been taken out as a

patent by the plaintiff, and to have been violated by the defendants. They are almost *ipsissimis verbis*. And when we are called upon to decide the meaning of the patent included in these letters, it seems our duty not only to look for aid to the specification as a specification, which is customary, (1 Gall. 437 ; 2 Story, R. 621 ; 1 Mason, C. C. 477,) but as a schedule, made here an integral portion of the letters themselves, and going out with them to the world, at first, as a part and parcel of them, and for this purpose united together for ever as identical.

It will thus be seen, that the effect of these changes in our patent laws and the long usage and construction under them is entirely to remove the objection, that the patent in this case was not as broad as the claim in the writ, and did not comply substantially with the requirements connected with the petition.

From want of full attention to the differences between the English laws and ours, on patents, the views thrown out in some of the early cases in this country do not entirely accord with those now offered. Paine, C. C. 441 ; Pennock et al. *v.* Dialogue, 2 Pet. 1. Some other diversity exists at times, in consequence of the act of 1793, and the usages under it in the patent-office, not being in all respects as the act of 1836. But it is not important, in this case, to go farther into these considerations.

The next objection is, that this description in the letters thus considered covers more than one patent, and is, therefore, void.

There seems to have been no good reason at first, unless it be a fiscal one on the part of the government when issuing patents, why more than one in favor of the same inventor should not be embraced in one instrument, like more than one tract of land in one deed, or patent for land. Phillips on Pat. 217.

Each could be set out in separate articles or paragraphs, as different counts for different matters in libels in admiralty or declarations at common law, and the specifications could be made distinct for each, and equally clear.

But to obtain more revenue, the public officers have generally declined to issue letters for more than one patent described in them. Renouard, 293 ; Phillips on Pat. 218. The courts have been disposed to acquiesce in the practice, as conducive to clearness and certainty. And if letters issue otherwise inadvertently, to hold them, as a general rule, null. But it is a well-established exception, that patents may be united, if two or more, included in one set of letters, relate to a like subject, or are in their nature or operation connected together. Phil. on Pat. 218, 219 ; Barrett *v.* Hall, 1 Mason, C. C. 447 ; Moody *v.* Fiske, 2 Mason, C. C. 112 ; Wyeth et al. *v.* Stone et al., 1 Story, 273.

Those here are of that character, being all connected with the use of the improvements in the steam-engine, as applied to propel carriages or vessels, and may therefore be united in one instrument.

Another objection is, that these letters, even when thus connected with the specification, are not sufficiently clear and certain in their description of the inventions.

This involves a question of law only in part, or so far as regards the construction of the written words used. Reutgen *v.* Kanowrs et al., 1 Wash. C. C. 168; Davis *v.* Palmer et al., 2 Brockenbrough, C. C. 303; Wood *v.* Underhill, 5 How. 1. The degree of clearness and freedom from ambiguity required in such cases is, by the patent act itself of 1793, to be sufficient " to distinguish the same from all other things before known, and to enable any person skilled in the art or science of which it is a branch, or with which it is most nearly connected, to make, compound, and use the same." 1 Statutes at Large, 321. See also on this, Godson on Pat. 153, 154; 2 Hen. Bl. 489; Wood *v.* Underhill, 5 How. 1; Davoll et al. *v.* Brown 1 Woodb. & Min. 57; Pet. C. C. 301; Sullivan *v.* Redfield, Paine, C. C. 441.

There are some further and laudable objects in having exactness to this extent, so as, when the specification is presented, to enable the commissioner of patents to judge correctly whether the matter claimed is new or too broad. 3 Wheat. 454; 3 Brod. & Bingh. 5; 1 Starkie, N. P. 192. So, also, to enable courts, when it is contested afterwards before them, to form a like judgment. 1 Starkie, N. P. 192. And so that the public, while the term continues, may be able to understand what the patent is, and refrain from its use, unless licensed. Webster on Pat. 86; 11 East, 105; 3 Merivale, 161; Evans *v.* Eaton, 3 Wash. C. C. 453; 4 Wash. C. C. 9; Bovill *v.* Moore, Davies's Cas. 361; Lowell *v.* Lewis, 1 Mason, C. C. 182 – 189.

In the present instance, yielding to the force of such reasons in favor of a due and rational degree of certainty in describing any improvements claimed as new, there still seems to us, though without the aid of experts and machinists, no difficulty in ascertaining, from the language used here, the new movement intended to be given to the steam-engine, by substituting a continued rotary motion for a crank motion, and the new form of the spiral wheel, when the engine is used in vessels, by changing the form of the paddles and placing them near the ends of the arms; and the new connection of the power with the capstan of such vessels, by inserting the upper end of the shaft into the capstan. It is obvious, also, that the inventor

claims as his improvement, not the whole of the engine, nor the whole of the wheel, but both merely in the new and superior form which he particularly sets out. He, therefore, does not claim too much, which might be bad. Hill *v.* Thompson et al., 2 J. Marsh. 435; 4 Wash. C. C. 68.; Godson on Patents, 189; Kay *v.* Marshall, 1 Mylne & Cr. 373; 1 Story, R. 273; 2 Mason, C. C. 112; 4 Barn. & Ald. 541; Bovill *v.* Moore, 2 Marsh. Com. P. Rep. 211.

The novelty in each he describes clearly, as he should; and it is not necessary he should go further. (1 Story, R. 286; Webster on Pat. 86, note. MacFarlane *v.* Price, 1 Starkie, 199; and King *v.* Cutler, ib. 354; 3 Car. & Payne, 611; 2 Mason, C. C. 112; Kingsby & Pirsson on Pat. 61; Godson on Pat. 154; Isaacs *v.* Cooper et al., 4 Wash. C. C. 259.

He need not describe particularly, and disclaim all the old parts. 7 Wheat. 435; Phil. on Pat. 270, and cases cited.

And the more especially is that unnecessary, when such disclaimer is manifestly, in substance, the result of his claiming as new only the portions which he does describe specially. All which is required on principle in order to be exact, and not ambiguous, thus becomes so.

It is to be recollected, likewise, that the models and drawings were a part of this case below, and are proper to be resorted to for clearer information. Earle *v.* Sawyer, 4 Mason, C. C. 9. With them and such explanatory testimony as experts and machinists could furnish, the court below were in a condition to understand better all the details, and to decide more correctly on the clearness of the description; but from all we have seen on the record alone, we do not hesitate to concur in the views on this point as expressed in that court.

In conclusion, on the other objections to the proof, as to the drawings and to the charge below in relation to the effect of them and to the destruction of them by fire, we likewise approve the directions given to the jury.

The destruction by fire was no fault of the inventor; and his rights had all become previously perfected. This is too plain to need further illustration. We cannot consent to be over astute in sustaining objections to patents. 4 East, 135.; Crosley *v.* Beverly, 3 Car. & Payne, 513, 514. The true rule of construction in respect to patents and specifications, and the doings generally of inventors, is to apply to them plain and ordinary principles, as we have endeavoured to on this occasion, and not, in this most metaphysical branch of modern law, to yield to subtilties and technicalities, unsuited to the subject and not in keeping with the liberal spirit of the age, and likely to prove ruinous to a class of the community so inconsiderate

41 *

and unskilled in business as men of genius and inventors usually are.

Indeed, the English letters-patent themselves now, however different may have been once their form or the practice under them, declare that "they are to be construed" "in the most favorable and beneficial sense, for the best advantage" of the patentee. Godson on Pat. 24, App. 7; Kingsby & Pirsson on Patents, 35. See also, on this rule, Grant *v.* Raymond, 6 Peters, 218; Ames *v.* Howard, 1 Sumner, 482 – 485; Wyeth *v.* Stone, 1 Story, R. 273, 287; Blanchard *v.* Sprague, 2 Story, R. 164; 2 Brockenbrough, C. C. 303; 2 Barn. & Ald. 345, in The King *v.* Wheeler; 5 Howard, 708, in Wilson *v.* Rousseau et al.; 1 Crompt., Mees., & Ros. 864, 876, in Russell *v.* Cowly.

The judgment below is affirmed.

*Note.* — After the delivery of this opinion, the counsel for the plaintiffs in error suggested that other questions were made below, which they desired to be considered, and therefore moved for another *certiorari* to bring them up. This was allowed, and judgment suspended till the next term.